IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| CHARLES R. STEINBERG, JR. and JENNIE STEINBERG, : : : Plaintiffs, : : : Civil Action No. v. : 7:04-CV-22 (HL) : SICA S.P.A., a Foreign Corporation : a/k/a SICA-ITALY, : : Defendant. : | |

**ORDER**

Before the Court is Defendant's Motion for Summary Judgment (Doc. 24). After consideration of the pleadings, depositions, affidavits, and briefs, the Court hereby grants Defendant's Motion for Summary Judgment for the reasons explained below.

**I. FACTS**

A. The Belling Machine

J.M. Manufacturing manufactures PVC pipe in varying diameters that are used for various commercial purposes. The pipe is originally formed so that the diameter of each end is identical; however, to allow the lengths of pipe to be connected together, some lengths of pipe are belled on one end to allow the slightly larger belled end of the pipe to fit securely over the normal end of another length of pipe. To achieve this belled shape, J.M. Manufacturing purchased several belling machines from Defendant.

These machines were manufactured by Defendant in its plant in Italy and transported to

J.M. Manufacturing's plant in Adel, Georgia. These machines employ a series of heaters designed to soften one end of a previously formed PVC pipe. While the end of the pipe is being heated a mechanical arm picks up a large metal O-ring and drops it into a chute in the middle of the machine. The O-ring is held in place at the bottom of the chute until the pipe has reached the required temperature. After the heaters are finished, a long ram with a bell shaped form on one end pushes into the soften end of the pipe, spreads the ends of the pipe to form a bell shape and pushes the O-ring into the pipe to form a seal. The pipe then rotates while the O-ring sets and the formed pipe cools. The belled pipe then leaves the machine and travels down a conveyor belt to be cooled, inspected, and stored.

The machine as designed encloses the portion of the machine where the ram plunges into the softened pipe in a metal container. On one side, there is a set of three mesh steel panels, one of which slides along a track to allow access. When the sliding panel is closed, it prevents access; however, when opened it exposes the operator to the moving parts of the machine. As a safety measure, SICA wired the sliding panel with an Omron brand safety switch, which automatically shuts down the machine when the panel was opened. The safety switch is a two part component that consists of a female panel and a male tab. The male tab is mounted to the sliding panel and the female panel is fixed to the machine. When the panel is in the closed position the male tab plugs into the female receptacle. When the panel is opened the male tab is pulled out of the female receptacle disrupting the circuit, which triggers the machine's shutdown. The shutdown procedure requires the machine to return to the initial stage of the particular cycle it was completing when the doors were opened. Although the machine did not

always return to the first cycle when the doors were open, a certain amount of product was lost each time the machine had to be shut down.

B. The "O" Ring Delivery System

Shortly after the machines were installed, J.M. Manufacturing began to have trouble with the "O" ring delivery system. The arm dropping the ring into the machine would miss the hopper and drop the ring onto the floor of the machine. This required an employee to open the sliding mesh door to retrieve the rings. This action, of course, also necessitated shutting down the machine. According to the evidence, the rings mis-dropped as much as once an hour. J.M. Manufacturing notified SICA of the problem and SICA sent a technician to the plant to devise a solution to the problem. The technician returned to SICA to develop a solution. In the meantime, J.M. Manufacturing designed and installed a ring-drop modification to attempt to remedy the problem. The SICA technician returned to install SICA's modification; however, he did not install it as J.M. had already modified the machine. This modification did not fix the problem.

When the SICA technician returned to install the modification, he observed the machine in question operating with the sliding mesh panel into the open position. According to the technician, the safety cutoff switch was circumvented in a way that allowed plant workers to access the moving parts of the machine in the event that one of the mis-dropped "O" rings needed to be removed. The SICA technician notified J.M. Manufacturing management and reinstalled a male tab that was missing from the sliding panel of the machine.

C. The Accident

On April 9, 2002, Charles Steinberg was working his shift at J.M. Manufacturing. According to Steinberg, the arm that was to grab the "O" ring and transport the ring to the machine was not properly grabbing the rings. In addition, the rings were not dropping correctly. After alerting management of the problem, Steinberg was told to handle the problem himself. Therefore, Steinberg began manually feeding the machine "O" rings. To do this he put his hand inside the machine and manually placed the ring at the bottom of the chute to allow the bell-shaped ram to catch the ring. At approximately five in the afternoon as Steinberg was again manually placing an "O" ring into the machine the machine began its regular cycle and the bell-shaped ram caught his arm, pulling it further into the machine. As a result, Steinberg's arm had to be amputated just above the elbow.

Due to the injuries he sustained Steinberg, along with his wife Jennie Steinberg, brought this action against the manufacturer of the machine, SICA. The Complaint includes three separate counts. Count one is a claim for compensatory damages, based on a strict liability, for an injury that allegedly resulted from defects in the belling machine involved in the accident. Count two is also a claim for compensatory damages; however, the claim is based on negligence and alleges Defendant negligently designed and manufactured the belling machine involved in the accident. Count three is a claim for punitive damages based on Defendant's alleged egregious conduct. In addition, Gennie Steinberg seeks damages for loss of consortium.

**II. ANALYSIS**

A. Summary Judgment Standard

Summary judgment must be granted if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When considering a motion for summary judgment, the Court must evaluate all evidence and any logical inferences in a light most favorable to the non-moving party.  Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995).

"[T]he plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time and discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  The movant carries the initial burden and must meet this burden "by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S. Ct. 2554. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmoving party is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S.

5

Ct. 2553. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; "there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Thus, under Rule 56 summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. 2552.

B. Defendant's Grounds for Summary Judgment

Defendant first argues that it cannot be liable for Plaintiffs' injury[1] as a matter of law because the injury was not proximately caused by any defect in the original design of the machine in question. According to Defendant, the original design of the machine in question incorporated a safety mechanism, designed to prevent the type of injury that occurred in this case, that was not functioning at the time of the accident. Second, Defendant alternatively argues that in the event Plaintiffs can prove negligence, Plaintiff Charles Steinberg assumed the risk of injury when he knowingly and voluntarily placed his hand inside the operating machine despite the known risk of harm. Because the Court finds that any alleged defect in the belling machine

---

[1] The Court notes that Plaintiff Jennie Steinberg is requesting compensation for injuries, loss of consortium, she sustained as a result of Plaintiff Charles Steinberg's injury. Although a spouse has a separate right of recovery for loss of consortium, "'[t]he actual injury to the wife from loss of consortium, which is the basis of the action, is the same as the actual injury to the husband from that cause.'"W.J. Bremer Co., Inc., v. Graham, 169 Ga. App. 115, 116, 312 S.E.2d 806, 807 (Ga. App. 1983) (quoting Brown v. Ga-Tenn. Coaches, Inc., 88 Ga. App. 519, 526, 77 S.E.2d 24, 28 (Ga. App. 1953)). Therefore, the Court will refer to Plaintiff Charles Steinberg's injury as Plaintiffs' injury.

or any alleged negligence on Defendant's part did not proximately cause Plaintiffs' injury, the Court will not address Defendant's remaining argument.

C. Proximate Cause

Plaintiffs have asserted separate claims under the theories of strict liability and negligence. First, under a strict liability theory, Plaintiffs allege[2] the belling machine was defective because the machine (1) lacked adequate guards, (2) lacked audible or visual warnings to alert an operator that the machine was about to cycle, (3) lacked a practical "kill" switch that would prevent the machine from going into cycle when it was dangerous to do so, (4) employed a malfunctioning "O" ring system that would not properly place the "O" ring without manual intervention, and (5) lacked adequate instructions or warnings regarding the operation of the machine. Second, under a negligence theory, Plaintiffs also allege Defendant's failure to exercise reasonable care in the design and manufacture of the belling machine resulted in the defects listed above.

Under Georgia product liability law,[3] a cause of action under a negligence theory and a cause of action under a strict liability theory requires essentially the same evidentiary showing.

---

[2] Although Plaintiffs include what they characterize as a non-exhaustive list of alleged defects in their complaint, they fail to allege additional defects of the belling machine in any subsequent pleading or the pleadings specifically regarding Defendant's Motion for Summary Judgment. Therefore, the Court will assume for the purposes of this motion, that Plaintiffs allege only those defects listed in their complaint.

[3] This case is before the Court on diversity jurisdiction pursuant to 28 U.S.C. § 1332 (2000). Accordingly, the Court follows Georgia substantive law as the law of the forum state. See Erie Railroad Co. v. Tompkins, 304 U.S. 64, 77, 58 S. Ct. 817, 822 (1938).

See Jones v. Amazing Products, Inc., 231 F. Supp. 2d 1228, 1238 (N.D. Ga 2002) ("Georgia case law has typically assumed that a strict liability "design defect" claim carries the same elements as a negligence claim aimed at the same alleged shortcomings in the product."), Coast Catamaran Corp. v. Mann, 171 Ga. App. 844, 848, 321 S.E.2d 353, 357 (Ga. App. 1984), overruled on other grounds, Banks v. ICI Americas, Inc., 264 Ga. 732, 733-34, 450 S.E.2d 671, 673 (Ga.1994) ("In the subject product-design case, only semantics [distinguish] the cause of action for negligence and a cause of action pursuant to [Georgia's strict liability statute]."). Further, whether a claim is based on negligence or strict liability, proximate cause is an indispensable element of the claim. See Talley v. City Tank Corp., 158 Ga. App. 130, 134, 279 S.E.2d 264, 269 (Ga. App. 1981) (citing Center Chemical Co. v. Parzini, 234 Ga. 868, 869, 218 S.E.2d 580, 582 (Ga. 1975), Union Carbide Corp. v. Holton, 136 Ga. App. 726, 728, 222 S.E.2d 105, 108 (Ga. App. 1975)). Finally, both Plaintiffs' negligence claim and strict liability claim allege that identical defects in the belling machine caused Plaintiffs' injuries. Therefore, for the limited purpose of determining whether the alleged defects in the belling machine proximately caused Plaintiff's injuries, the Court will not distinguish between Plaintiff's negligence claim and Plaintiff's strict liability claim.

    An essential element of any products liability action is proximate cause. Talley, 158 Ga. App. at 134, 279 S.E.2d at 269. A plaintiff must first establish that the defendant's negligence was the direct cause of the plaintiff's injury, or that the defendant's negligence put into motion the sequence of events that caused plaintiff's injury. Glisson v. Freeman, 243 Ga. App. 92, 108, 532 S.E.2d 442, 455 (Ga. App. 2000). In addition, a plaintiff must also prove that the injury

sustained is a reasonably foreseeable result of defendant's negligence. Morris v. Baxter, 225 Ga. App. 186, 187, 483 S.E.2d 650, 651 (Ga. App. 1997). Foreseeability in this context means that which would be forseeably probable or objectively reasonable to expect, not merely what might occur. Greenway v. Peabody Intl. Corp., 163 Ga. App. 698, 703-04, 249 S.E.2d 541, 546-47 (Ga. App. 1982).

"If two negligent acts are so related that the first would not probably have resulted in injury if the other had not occurred, and the latter amounts to such a preponderating cause that it probably would have produced the injury even if the first negligence had not occurred, . . . we say that the first negligent cause is not the proximate cause." Ethridge v. Nicholson, 80 Ga. App. 693, 696, 57 S.E.2d 231, 233 (Ga. App. 1950). In terms of legal liability, the latter negligent act intervenes to break the chain of causal connection. Therefore, "[t]here can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury." Union Carbide v. Holton, 136 Ga. App. 726, 729, 222 S.E.2d 105, 109 (Ga. App. 1975). While the issue of proximate cause is generally one for the jury, proximate cause may be decided as a matter of law where the evidence shows that the jury could only reasonably reach one conclusion. Smith v. Bel-Arbor, Inc., 121 Ga. App. 739, 740, 175 S.E.2d 146, 147 (Ga. App. 1970).

Under Georgia law, liability is only imposed for injuries which are the proximate result of product defects, not for the manufacture of defective products. Talley, 158 Ga. App. at 135,

279 S.E.2d at 269. "Unless the manufacturer's defective product can be shown to be the proximate cause of the injuries, there can be no recovery." Id. In addition, a manufacturer has an "absolute right" to have its liability determined based on the design of its own product and not that of another. Id. Therefore, when a manufacturer is sued for injuries resulting from a defect in a product, "if the design of that product has been independently altered, eliminated and replaced by a third party after the sale" any injuries that result cannot be the proximate result of any defect in the product. Id.

Two cases, interpreting Georgia law, are particularly applicable here. In Argo v. Perfection Products, Co., 730 F. Supp. 1109 (N.D. Ga. 1989), the United States District Court for the Northern District of Georgia, sitting in diversity, decided a products liability case similar to the one here. In Argo, two employees of a fiberglass company were injured when, in an attempt to light a gas heater one of the employees flicked his lighter, causing an explosion of propane gas. Id. at 1111. The employees brought suit against the manufacturer of the heater alleging the heater was defective and negligently designed. Id. at 1115.

The gas heater at the center of the case was manufactured with a safety control valve which controlled the flow of gas to the burner. When the heater was in operation, heat from the burner allowed the valve to remain open; however, if the burner went out, a mechanism within the valve cooled causing the valve to close and the flow of gas to stop. Id. at 1112. In order to initially light the heater, one would have to press a small red reset button, which would manually open the safety control valve to allow fuel to flow. Id. On the day the accident occurred, the heater was set up in an enclosed trailer in an effort to prevent a substance used by the company

from getting too cold. Instead of temporarily depressing the red reset button to light the heater, the reset button on the safety valve was taped down in the open position so that it could not perform its intended safety function. Id.

There was no evidence of who exactly set up and started the heater; however, the heater went out when all the oxygen was depleted in the enclosed trailer. Id. at 1114. As a result, propane gas continued to flow spewing into the trailer because the safety shut-off valve was bypassed. Id. at 1114. When the plaintiffs were asked to relight the heater, the lighter ignited the gas that had accumulated in the trailer and an explosion resulted. Id. at 1113. The court determined that the heater was not the cause of the plaintiffs' injuries because the heater was reasonably safe for the purpose intended. The court further held that "no reasonable juror could find that the manufacturing defendants could have foreseen that the red automatic safety shut-off switch . . . would be taped down by an industrial user so as to defeat the valve's safety function." Id. at 1119. Accordingly, the court granted the manufacturer's motion for summary judgment. Id.

Similarly in F.C. McNeely v. Harrison, 138 Ga. App. 310, 226 S.E.2d 112, the Georgia Court of Appeals affirmed a trial court's grant of summary judgment to the manufacturer of an allegedly defective automobile. In F.C. McNeely, a bystander was injured when an automobile lurched forward suddenly pinning him against a carport wall. Id. at 311, 226 S.E.2d at 1113. On the day of the accident, Mrs. Harrison attempted to start her car, which was parked in the carport by her house. Id. at 310, 226 S.E.2d at 1113. After several attempts she called her husband; however, he was not able to start the car. Id. Her son then arrived and also attempted to start the

11

car. Harrison's son arrived with his friend, the plaintiff McNeely. Id.

After more unsuccessful attempts to start the car, Harrison's husband and son came to the conclusion that the source of the problem was likely a shortage in the electrical system. Id. at 311, 226 S.E.2d at 1113. In an attempt to remedy the problem, the son bypassed the car's solenoid switch, which allowed electrical current to flow directly from the battery to the starter. When Mr. Harrison attempted to start the car again, it lurched forward pinning McNeely between the wall and the front of the car. Id. Mr. Harrison then shifted the gear lever to reverse, but again the car lurched forward pinning McNeely further. Id. McNeely subsequently sued the manufacturer of the car for injuries sustained as a result of the allegedly defective car. Id. at 312, 226 S.E.2d at 1114.

After the accident the car was inspected and it was discovered that a pin which connected the gear-shift lever to the steering column was missing. Id. at 311, 226 S.E.2d at 1113. Its absence had prevented Mr. Harrison from being able to change the car's gears into reverse. Id., 226 S.E.2d at 1114. The inspection also revealed that the car's solenoid switch operated as a safety device because the switch prevented the car from starting or moving forward when it was not in the park gear. Id. In affirming the trial court's grant of summary judgment to the car manufacturer, the court held that the plaintiff's injuries were not proximately caused by any alleged defect in the car, but rather by the act of bypassing the solenoid safety device. Id. at 313, 226 S.E.2d at 1115.

The court explained that "as long as the mere defect [of the missing pin], which had kept the car in the 'drive' gear, was left or allowed to remain in the condition without interference

in the solenoid switch . . ., the particular injury of which plaintiff complains would not have occurred." Id. at 312, 226 S.E.2d at 1114. In addressing the argument that tampering with the solenoid switch was conceivably reasonable, the court explained "if the solenoid switch existed for the purpose of preventing the movement of the vehicle unless the vehicle was in 'park,' then tampering with the solenoid switch as to nullify its effectiveness and thereby cause movement can not possibly be reasonable, proper or warranted under the circumstances." Id., 226 S.E.2d at 1115.

In this case, the undisputed evidence shows the electric safety cutoff switch on the belling machine in question was not functioning at the time of the accident. Further, it is undisputed that the electric safety cutoff switch, like the safety shut-off value in Argo and the solenoid safety device in F.C. McNeely, was designed to prevent the particular injury that occurred. In fact Plaintiffs' own expert testified that had the switch been functioning at the time of the accident, the switch would have prevented the injury that was ultimately sustained by Plaintiffs. According to the undisputed evidence, in spite of any alleged defects present in the belling machine, had the safety cutoff switch been functioning, the machine would have immediately ceased operating when the sliding mesh doors to the machine were opened and Plaintiffs' injury would not have occurred. Therefore, the alleged defects in the belling machine did not cause Plaintiffs' injuries. It was the disabled safety cutoff switch that allowed the machine to continue to operate with the mesh doors open that allowed Plaintiff Charles Steinberg to become injured when he inserted his arm into the operating machine.

Although it is undisputed that the safety cutoff switch was disabled at the time of the

accident, there is no evidence of exactly why or how the safety cutoff switch stopped functioning. The parties do agree, however, that the safety switch was disabled in one of two ways. At the time of the accident the male tab, which should have been affixed to the sliding door, was lodged into the fixed female receptacle allowing the sliding mesh door to be opened without alerting the safety cutoff switch. Therefore, according to the undisputed evidence, the tab either accidentally broke off of the door and lodged in the fixed panel or someone intentionally circumvented the switch by detaching the tab from the sliding door and placing it into the fixed panel.[4]

1. *Accidental Circumvention of the Safety Cutoff Switch*

---

[4]David Ellis, the divisional manager of services at J.M. Manufacturing, testified as follows:
> Q. And that the reason it was not working whether it was intentionally taken out of service or unintentionally because it broke or something like that, nobody knows for sure?
> A. Correct. I didn't get to look at it, you know.

Ellis Dep. 19:24-20:3, April 19, 2005. David Harvey, the divisional production superintendent at J.M. Manufacturing, testified as follows:
> Q. And the switch had been taken out of service in some way either intentionally or otherwise?
> A. Yes, it was taken out of service.
> Q. Do you know – Can you tell me how the switch was taken out of service?
> A. I don't know the details.
> Q. Did you hear whether it was done intentionally or unintentionally?
> A. Only hearsay, I don't know.

Harvey Dep. 19:20-25, April 19, 2005. Steve Moore, the general foreman at J.M. Manufacturing, testified as follows:
> Q. Either somebody jimmied the switch so that it stayed as a complete circuit so that you could open the doors and it wouldn't cut the machine off or possibly something broke off in there accidently; is that fair?
> A. That's correct.

Moore Dep. 22:6-10, April 19, 2005.

In the event the male tap was defective and accidently broke off of the door and lodged into the fixed panel, Plaintiffs would not be able to recover. Under Georgia law a manufacturer is not held liable when injuries "[result] from negligent installation or maintenance occurring after the product left the manufacturer, and the product was sold to a commercial operator who may reasonably have been expected to be familiar with the dangers resulting from such misuse or neglect." Carmical v. Bell Helicopter Textron, Inc., 117 F.3d 490, 495 (11th Cir. 1997). See also Omark Industries, Inc. v. Alewine, 171 Ga.App. 207, 209, 319 S.E.2d 24, 26 (Ga. App. 1984) (holding manufacturer of hydraulic loading mechanism was not liable because injuries sustained by operator when hydraulic hose burst resulted from negligent installation or maintenance occurring after product left the manufacturer), Union Carbide, 136 Ga.App. at 729-30, 222 S.E.2d at 109 (Ga.App. 1975) (holding plaintiff was precluded from recovering against manufacturer when his injury was caused by the misuse of the product).

According to the undisputed evidence offered by Plaintiff Charles Steinberg himself, when he first moved to the belling machine in question it was being operated with the metal tab lodged in the fixed panel. According to his testimony, the machine was operated in that manner for at least three months prior to the accident. (Steinberg Depo. 27:14-25, 33:11-23, Sept. 29, 2004.) Further, the divisional manager of services at the plant, David Ellis, testified that had the safety switch needed to be replaced, the company had people who could replace it. (Ellis Depo. 20:17-19, April 20, 2005.) Therefore, even if the safety cutoff switch was disabled due to a defect in the metal tab, J.M. Manufacturing should have noticed, over a period of at least three months, that the safety switch was inoperable and fixed the problem in the course of their normal

maintenance procedures. Accordingly, even assuming the metal tab accidently broke off of the door and lodged into the fixed panel, Plaintiffs cannot recover against Defendant as Georgia law will not hold a manufacturer liable when injuries result from negligent maintenance occurring after the product leaves the manufacturer.

*2. Intentional Circumvention of the Safety Cutoff Switch*

In the event the safety cutoff switch was intentionally circumvented in order to allow access to the inside of the machine without alerting the safety switch, then Plaintiffs could only recover from Defendant if it was established that Defendant or one of its agents actually circumvented the safety cutoff switch. There is simply no evidence that even suggests Defendant was responsible for intentionally circumventing the safety cutoff switch. Therefore, under this scenario, the circumvention of the safety cutoff switch, designed to prevent the type of injury which occurred, constitutes an intervening act sufficient to relieve Defendant of liability. See Argo, 730 F. Supp. at 1119, F.C. McNeely, 138 Ga. App. at 312, 226 S.E.2d 115.

Plaintiffs argue that there is a issue of material fact as to who circumvented the safety cutoff switch. The Court does not agree. As long as there is no evidence that Defendant was responsible from circumventing the safety cutoff switch, it makes no difference, in terms of Defendant's liability, who exactly circumvented the safety cutoff switch. The circumvention of the switch would nevertheless constitute an intervening act sufficient to relieve Defendant of liability. Because Plaintiffs have offered no evidence and does not even seem to suggest that Defendant circumvented the safety cutoff switch, there is no material issue of fact with respect to this issue.

Plaintiffs also argue that the eventual circumvention of the safety cutoff switch was foreseeable in light of the malfunctioning "O" ring delivery system.[5] The Court disagrees. In determining whether something was or was not legally foreseeable, "[f]oreseeability means that which is objectively reasonable to expect, not merely what might occur." Greenway, 163 Ga. App. at 704, 249 S.E.2d at 547(quoting Winett v. Winett, 57 Ill.2d 7, 12, 310 N.E.2d 1, 5 (Ill. 1974)). Again, as discussed above, in cases strikingly similar to this one, both a federal district court interpreting Georgia law and the Georgia Court of Appeals, have granted summary judgment to the manufacturer of a product on the ground that the circumvention of a safety device, which was designed to prevent the injury that ultimately occurred, was not reasonably foreseeable. See Argo, 730 F. Supp. at 1119, F.C. McNeely, 138 Ga. App. at 313, 226 S.E.2d at 115.

In Argo and F.C. McNeely, the safety device in question, like the one here, was circumvented in a way that defeated its safety function. In Argo a button was taped down in order to prevent the safety valve in a heater from stopping the flow of gas, in F.C. McNeely, a solenoid switch was "jumped" in order to allow electrical current to flow directly to the starter, and here a safety cutoff switch was tampered with in order to have access to the inner moving parts of a large machine. See Argo, 730 F. Supp. at 1112, F.C. McNeely, 138 Ga. App. at 311-13, 226 S.E.2d at 113-15. Further, in Argo and F.C. McNeely, the safety devices circumvented,

---

[5]According to Plaintiffs this issue should be reserved for the jury. Although the issue of forseeability is ordinarily a jury question, where the relevant evidence is clear and leads to only one reasonable conclusion, as in this case, the issue of forseeability may be decided as a matter of law. Smith, 121 Ga. App. at 740, 175 S.E.2d at 147.

17

again like the one here, were designed to prevent the specific injury that ultimately occurred. See Argo, 730 F. Supp. at 1113-14, F.C. McNeely, 138 Ga. App. at 311, 226 S.E.2d at 113. Finally, in Argo and F.C. McNeely, the safety device was circumvented, again like the one here, in order to correct an alleged problem or inconvenience created by the product. See Argo, 730 F. Supp. at 1113, F.C. McNeely, 138 Ga. App. at 310-11, 226 S.E.2d at 113. Therefore, the Court determines, in accordance with Georgia law, that it was not objectively reasonable, despite an alleged malfunctioning "O" ring delivery system, to expect that someone would intentionally circumvent the safety cutoff switch in order to have access to the inner workings of the machine while it was in operation.

Therefore, as explained above, whether accidently or intentionally, the circumvention of the safety cutoff switch constitutes an unforeseeable intervening act sufficient to relieve Defendant of liability. The Court thus concludes for the reasons set forth above that any alleged defect in the belling machine or any alleged negligence on Defendant's part did not proximately cause Plaintiffs' injury. Accordingly, the Court grants Defendant's Motion for Summary Judgment with respect to Plaintiffs' strict liability and negligence claims.

### D. Plaintiffs' Punitive Damage Claim

Georgia law permits the recovery of punitive damages "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. §51-12-5.1(b) (2000). Moreover, because "'a claim for punitive damages has efficacy only if there is a valid claim for

actual damages to which it could attach,'" punitive damages "'may not be recovered where there is no entitlement to compensatory damages.'" Southern General Ins. Co. v. Holt, 262 Ga. 267, 270, 416 S.E.2d 274, 277 (Ga. 1992) (quoting Barnes v. White County Bank, 170 Ga.App. 681, 681, 318 S.E.2d 74, 76 (1984)). Therefore, because the Court has determined Defendant is entitled to a judgment as a matter of law with respect to Plaintiffs' tort claims, Plaintiffs' have no remaining tort claims on which an award of punitive damages may be based. Accordingly, Defendant's Motion for Summary Judgment is also granted with respect to Plaintiffs' punitive damage claim.

### III. CONCLUSION

In conclusion, for the reasons set forth above, Defendant's Motion for Summary Judgment is granted.

**SO ORDERED**, this the 9th day of March, 2006.


**/s/ Hugh Lawson**
**HUGH LAWSON, Judge**

scs